[Cite as *State v. Scott*, 2026-Ohio-2513.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY

State of Ohio

        Appellee

v.

Miller Scott

        Appellant

Court of Appeals No. {72}S-25-025

Trial Court No. 23CR990

**DECISION AND JUDGMENT**

Decided: June 30, 2026

\* \* \* \* \*

Beth Tishler, Sandusky County Prosecuting Attorney, and
Emily A. Witter, Assistant Prosecuting Attorney, for appellee.

Samuel E. Gold, for appellant.

\* \* \* \* \*

**DUHART, J.**

{¶ 1} Appellant, Miller Scott, appeals from a judgment entered by the Sandusky County Court of Common Pleas convicting him, following a plea of no contest, on one count of trafficking in cocaine and one count of possession of cocaine. For the reasons that follow, the trial court's judgment is affirmed.

## Statement of the Case and the Facts

## Background

{¶ 2} On November 3, 2023, Scott was indicted on one count of trafficking in cocaine, in violation of R.C. 2925.03(A)(2) and (C)(4)(d), a felony of the third degree (Count 1); and one count of possession of cocaine, in violation of R.C. 2925.11(A) and (C)(4)(c), also a felony of the third degree (Count 2). The charges arose after 16.89 grams of cocaine were discovered in Scott's car following a dog sniff that was conducted in connection with a traffic stop.

{¶ 3} On May 14, 2024, Scott's trial counsel filed a motion to suppress evidence and to dismiss the indictment. The motion contended, among other things, that the officers' stop unlawfully targeted Scott for a pretextual traffic stop because of his race. The State opposed Scott's motion. Hearing on the matter took place on September 16, 2024. Both sides presented testimony, as follows.

## Suppression Hearing

## State's Evidence

{¶ 4} **Det. Davenport.** Clyde Police Department Detective Alexander Davenport testified that on June 7, 2023, while working interdiction detail as part of the Drug Task force, he was assigned to watch the location of The Copper Penny bar because it was known as a high drug trafficking area. He denied that he was there because black people were there.

2.

{¶ 5} Davenport testified that a red SUV arrived at The Copper Penny and then left a short time after. Davenport, who was in an unmarked vehicle, drove up behind the red SUV and observed a turn signal violation. He alerted Fremont Police Detectives Ryan Reed and Christian Ortolani, who were assisting in the interdiction effort and were in a marked patrol vehicle.

{¶ 6} **Det. Ortolani.** Detective Ortolani testified that while working interdiction on June 7, 2023, he was clearly marked as a police officer. With him in his marked Fremont Police Department cruiser was Detective Reed. Ortolani testified that he was notified of the red SUV leaving the location of The Copper Penny, and that he drove up behind the vehicle and saw it cross over the fog line in the area of some train tracks.

{¶ 7} Based on the traffic violation, Ortolani activated his body camera, pulled the vehicle over and approached the driver's side door, where he encountered Scott. A video recording of the stop was entered into evidence at the suppression hearing.

{¶ 8} The video recording shows Ortolani telling Scott that he went off the road at the train tracks, and Scott explaining that this was because of a pothole. Next, Ortolani asks Scott for his driver's license and for permission to search the vehicle. Scott denies permission to search. Ortolani explains that he is going to start issuing the traffic citation and that a canine will arrive, based on where Scott had been just prior to the stop. Ortolani states that he is not going to stall, but Scott keeps the conversation going.

{¶ 9} At two minutes and seven seconds into the recording, Scott is seen getting out his driver's license. As soon as Ortolani is handed the driver's license, he calls it in on his police radio. At two minutes and 15 seconds, Ortolani states that the K-9 has

3.

arrived, and at two minutes and 30 seconds, conversation between Scott and Ortolani stops and the K-9 is deployed. Somewhere between two minutes and 30 seconds and three minutes into the stop, the K-9 alerts, indicating the odor of narcotics on the passenger side of the vehicle. Scott is then taken into custody.

{¶ 10} At four minutes and six seconds into the recording, Ortolani asks Scott who the car belongs to, and at four minutes and 11 seconds, Ortolani tells Scott he ran his license. Scott responds that the record should confirm that the car is his.

{¶ 11} At the hearing, Ortolani confirmed that he had not yet started to write the traffic citation when the K-9 arrived. He explained that he was not stalling, and in fact had tried to break away, but Scott re-engaged in conversation with him.

{¶ 12} Ortolani conceded on cross-examination that the traffic stop was pretextual based on Scott's having come from The Copper Penny, and that during the dog sniff he watched the dog and was not actively writing a citation. He further conceded that no traffic citation was ever issued for the traffic stop.

{¶ 13} **Det. Reed.** Detective Reed testified that he, too, saw Scott's car drive off the road to the right, crossing the fog line, and that this was a marked lanes violation. He further testified that, like Ortolani, he was wearing a body camera at the time of the traffic stop. The video from his body camera shows that the K-9 arrived just one minute and eight seconds into the traffic stop, and that the indication from the K-9 occurred less than two minutes later. Reed explained that the K-9's indication provided probable cause to search the vehicle. Reed testified that he did not stop Scott because he was black, but as a pretextual stop because the Drug Task Force asked him to.

4.

{¶ 14} On cross-examination, Reed acknowledged that he did not issue a traffic citation and, in fact, took no action to effectuate the traffic stop.

{¶ 15} **Sgt. Dorsey.** K-9 handler Sergeant George Dorsey of the Sandusky County Sheriff's Office testified that he was asked to assist in the subject traffic stop. He confirmed that the dog alerted to the odor of narcotics in Scott's car at two minutes and 32 seconds into Reed's bodycam video.

**Defense Evidence**

{¶ 16} **Miller Scott.** Scott himself was the final witness to testify at the suppression hearing and the only witness to testify on behalf of the defense. He stated that just prior to being pulled over, he had stopped at The Copper Penny to have a beer, but as soon as he walked through the door, he received a phone call from someone notifying him that he was supposed to take her son's senior pictures that day. Scott stated that he immediately turned around and walked out of the bar. He stated that he "wasn't in the Copper Penny 45 seconds."

{¶ 17} Scott testified that he got in his car and drove away, committing no traffic violations, when he noticed a police car coming up behind him. He admitted that when he got to the railroad tracks, which have "a lot of potholes," he "swerved up around" a pothole, but he stated that he did not believe he went far enough to go over the line.

{¶ 18} Scott testified that he was pulled over and that "they start talking about crack out of the Copper Penny," and that "they said that [he] didn't use a turn signal." Scott stated that he had in fact used his turn signal.

5.

{¶ 19} Scott acknowledged on cross examination that officers notified him that the purpose of the stop was because he swerved on the railroad tracks, but he said he was never accused of doing anything wrong.

**Post Suppression Hearing**

{¶ 20} After hearing arguments from counsel for both sides, the trial court took the matter under advisement. On September 30, 2024, the trial court issued a decision denying Scott's motion to suppress. As part of its analysis, the trial court stated:

> '[W]here an officer has an articulable reasonable suspicion or probable cause to stop a motorist for any criminal violation, including a minor traffic violation, the stop is constitutionally valid regardless of the officer's underlying subjective intent or motivation for stopping the vehicle in question.' [Citation omitted.]
>
> The ulterior motive can include allegations of racial profiling. 'Racial profiling has been rejected as a legal basis for suppression of evidence.' *State v. Dukes*, 2017-Ohio-7204, ¶ 17 (4th Dist.); and *State v. Hansard*, 2020-Ohio-5528, ¶ 29 (4th Dist.)

{¶ 21} The trial court went on to recognize that the officers' ulterior motive was related not to racial profiling but, rather, to Scott's visit to The Copper Penny, which was a known drug trafficking location:

> As the defendant had briefly frequented The Copper Penny, a know [sic] drug trafficking location, law enforcement had an ulterior motive to initiate the traffic stop. Such ulterior motive is not unconstitutional. The fact that The Copper Penny was a bar frequented by black individuals and that Mr. Scott was a black individual also does not make the stop unconstitutional.

{¶ 22} On March 31, 2025, Scott entered a no contest plea to the two charges and the matter was scheduled for sentencing. At sentencing, the trial court found that Scott's

6.

convictions merged and the State elected to proceed on Count 1. The trial court imposed a term of 18 months in prison, with a stay of execution of the sentence pending appeal. Scott's appellate counsel filed a delayed notice of appeal on August 26, 2025.

## Assignment of Error

{¶ 23} On appeal, Scott asserts the following assignment of error:

> I. The trial court erred to the prejudice of Appellant when denying his motion to suppress the traffic stop as the ruling permits racial bias and selective policing.

## Law and Analysis

{¶ 24} In his sole assignment of error, Scott argues that the trial court erred in denying his motion to suppress the underlying traffic stop.

{¶ 25} "'Appellate review of a motion to suppress presents a mixed question of law and fact.'" *State v. Donaldson*, 2019-Ohio-232. ¶ 14 (6th Dist.), quoting *State v. Burnside*, 2003-Ohio-5372, ¶ 8. "When the trial court considers a motion to suppress, it acts as the factfinder and is in the best position to resolve factual questions and to evaluate the credibility of witnesses." *Donaldson* at *id.*, citing *Burnside* at *id.* The appellate court accepts the trial court's findings of fact if they are supported by competent, credible evidence, but must independently determine whether the facts satisfy the applicable legal standard without deferring to the trial court's legal conclusions. *Id.*

{¶ 26} The Fourth Amendment to the United States Constitution guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Article I, Section 14 of the

7.

Ohio Constitution is almost identical and "affords the same protection in felony cases." *State v. Eatmon*, 2022-Ohio-1197, ¶ 27.

{¶ 27} The Ohio Supreme Court held in *Dayton v. Erickson*, 76 Ohio St.3d 3 (1996), that "[w]here an officer stops a vehicle based on probable cause that a traffic violation has occurred or was occurring, the stop is not unreasonable under the Fourth Amendment to the United States Constitution even if the officer had some ulterior motive for making the stop, such as a suspicion that the violator was engaging in more nefarious criminal activity." *Id.* at the syllabus, citing *United States v. Ferguson,* 8 F.3d 385 (6th Cir.1993) Here, we find the stop for a marked lanes violation was valid, even if pretextual in the sense that police had suspicion, based on Scott's actions at The Copper Penny, that Scott was involved in drug trafficking activity.

{¶ 28} On appeal, Scott does not challenge the validity of the K-9 alert, the search of his car, or the length of his detention. He argues only that "[w]hile the driving infractions were sufficient to warrant a stop, nothing about the interaction between law enforcement and [Scott] at the time of the stop should have given suspicion that there were narcotics in the car," and that the trial court's rationale "invites a conclusion that racial profiling is permissible in any instance where the most basic of probable cause can be justified."

{¶ 29} In this case, Ortolani testified that he had been assigned to watch The Copper Penny because it was a known drug trafficking location. He further testified that Scott had been seen going into, and within a short time leaving, that location. Ortolani

8.

additionally testified that he had not been watching The Copper Penny because there were black people at that location and he did not stop Scott because he was black.

{¶ 30} The trial court's assertion that racial profiling could constitute a lawful ulterior motive for an officer's conduct was unnecessary to its analysis and had no bearing on its ultimate conclusion. The court nonetheless properly determined that the traffic stop was lawful based on Scott's actions at a location known for drug-trafficking activity. Accordingly, Scott's sole assignment of error is found not well-taken.

**Conclusion**

{¶ 31} The judgment of the Sandusky County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

| Myron C. Duhart, J. | [[Applied Signature]] |
| | JUDGE |
| | |
| Gene A. Zmuda, J. | [[Applied Signature 2]] |
| | JUDGE |
| | |
| Charles E. Sulek, J. | [[Applied Signature 3]] |
| CONCUR. | JUDGE |

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.